UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

----oo0oo----

RANDY F. GAUB and MILISSA M.
GAUB,

        NO. CIV. 1:10-313 WBS

      Plaintiffs,

    v.                   MEMORANDUM AND ORDER RE:
                           MOTIONS FOR SUMMARY JUDGMENT

PROFESSIONAL HOSPITAL SUPPLY,
INC., a California Corporation,

      Defendant.

_____/

----oo0oo----

      Plaintiffs Randy F. Gaub and Milissa M. Gaub brought this action against their employer, defendant Professional Hospital Supply, Inc. ("PHS"), alleging retaliation and sexual harassment pursuant to Title VII of the Civil Rights Act of 1964. Currently before the court are PHS's motions for summary judgment of all claims pursuant to Federal Rule of Civil Procedure 56.

I.   Relevant Facts

      It is undisputed that the Gaubs were both employees of PHS. Randy Gaub was hired by PHS as a speciality representative on July 9, 2002, and became a full line representative in May of 2007. (Bailey

1

Aff. Exs. 1, 2 (Docket No. 37).)  Milissa Gaub became a PHS employee

in January of 2008, when she was hired as a full line sales

representative.  (Bailey Aff. Ex. 6.)  In their work, the Gaubs were

both directly supervised by Bob Umdenstock, another PHS employee.

(Def.'s Statement of Material Undisputed Facts II ¶ 3 (Docket No. 38);

R. Gaub Aff. ¶ 2 (Docket No. 50).).)

    Mrs. Gaub suffers from chronic anxiety and chronic

depression.  (Bailey Aff. Ex. 9 ("M. Gaub Dep. I") at 27:5-28:25,

50:14-17.)  She is also an alcoholic.  (Id. at 58:16.)  In March of

2008, she was treated for alcoholism at Intermountain Hospital, a

drug, alcohol, and psychiatric treatment facility, where she stayed

for less than a week.  (Id. at 61:10; Tharp Aff. Ex. A ("R. Gaub. Dep.

II") at 275:3-16 (Docket No. 43); M. Gaub Aff. ¶ 14 (Docket No. 42).)

    In May of 2008, Mrs. Gaub and Mr. Umdenstock traveled to

Pocatello, Idaho in order to meet with several of Mrs. Gaub's

customers.  (Bailey Aff. Ex. 19 ("Umdenstock Dep. I") at 71:1-73:17.)

On May 20, 2008, Mrs. Gaub and Mr. Umdenstock made a sales call to

Portneuf Medical Center ("Portneuf").  (Id. at 73:9-20; Tharp Aff. Ex

B ("M. Gaub Dep. II") at 101:20-25.)  Mrs. Gaub acknowledges that

there were some complaints regarding her performance, but

characterizes the fact that Mr. Umdenstock came along on the trip as

"routine."  (Bailey Aff. Ex. 10 at 7.)  According to PHS, Mr.

Umdenstock accompanied Mrs. Gaub on this trip because of complaints

Portneuf had made about Mrs. Gaub's performance.  (Tharp Aff. Ex. C

("Umdenstock Dep. II") at 71:7-18.)

    After meeting with Portneuf, Mr. Umdenstock and Mrs. Gaub

returned to their hotel.  Initially they returned to their separate

rooms to work individually, but later met to go over the earlier

meeting. (M. Gaub Dep. II at 115:15-23, 118:18-22.) According to Mrs. Gaub, they met at the hotel bar. (Id. at 118:11-15.) They discussed some of the concerns Portneuf had regarding Mrs. Gaub's performance, and Mr. Umdenstock suggested ways in which Mrs. Gaub could improve. (Id. at 112:13-114:1.) Mrs. Gaub states that during this meeting they had several drinks. (Id. 119:4-6.) According to Mr. Umdenstock, the two did not begin drinking until after they had concluded their work-related discussion. (Umdenstock Dep. II at 84:4-7.)

According to Mrs. Gaub, Mr. Umdenstock then suggested that they go out to dinner at a nearby restaurant and she felt as though she was obligated go along with his suggestion as he was her boss. (M. Gaub Dep. II at 121:18-123:1.) At dinner, both Mrs. Gaub and Mr. Umdenstock continued to drink. (Id. at 123:5-17.) Following dinner, the two returned to the hotel bar, where they had several more alcoholic beverages. (Id. at 124:3-19.) Mrs. Gaub characterizes her decision to consume alcoholic drinks before, after, and during dinner as "voluntary" and as decisions she made "of her own accord" or her "own free will." (Id. at 119:7-17, 123:9-13, 125:16-19.) She also states, however, that she "felt obligated" to have drinks with Mr. Umdenstock. (Id. at 128:17-18.)

According to Mrs. Gaub, after the two left the hotel bar to return to their rooms, they stopped in the hallway in front of his room and Mr. Umdenstock turned around and kissed her. (M. Gaub Dep. I at 134:1-15; Bailey Aff. Ex. 14 at PHS00315.) They then entered his room, where they "fooled around." (Bailey Aff. Ex. 14 at PHS00315.) Both were very intoxicated by this point. (Id.) She then returned to her hotel room. (M. Gaub Dep. II at 137:5-18.) Some time later, she

contends that he called her and asked "What's taking you so long?," and she went back to his hotel room, where she found him lying naked in bed. (Bailey Aff. Ex. 14 at PHS00315; M. Gaub Dep. I at 145:18-146:6.) She claims the two then engaged in sexual relations. (M. Gaub Dep. II at 144:6-8.) Mrs. Gaub testified that although Mr. Umdenstock never explicitly used his position as her supervisor to force her to have sex with him, Mr. Umdenstock was a "very intimidating fellow," and she felt "obligated" to have sex with him. (<u>Id.</u> at 145:13-147:25.)

Mr. Umdenstock claims that it was Mrs. Gaub who kissed him outside of his hotel room, and that ever since they began drinking before dinner, she had indicated a desire to have sex with him. (Bailey Aff. Ex. 14 at PHS00311.) According to him, Mrs. Gaub returned to her room after kissing him, but called him sometime after midnight to again proposition him. (<u>Id.</u> at PHS00311-12.) He states that he rejected her offer and did not have any other contact with her until the next morning, when they met in the hotel lobby in order to go on another sales call. (<u>Id.</u> at PHS00312.)

After returning from Pocatello, Mrs. Gaub fell into a depressive, anxious state. (Bailey Aff. Ex. 10 at 1.) She remained in bed for a week, consuming approximately two bottles of wine a day. (<u>Id.</u>; M. Gaub Dep. II at 158:6-159:14.) She did not initially tell her husband what had transpired in Pocatello between herself and Mr. Umdenstock. ®. Gaub Dep. II at 167:20-168:12.)

On May 26, 2008, Mrs. Gaub told her husband to call Mr. Umdenstock and tell him that she was resigning. (Bailey Aff. Ex. 10 at 1; R. Gaub Dep. II at 198:3-13, 278:15-18; Bailey Aff. Ex. 17 at 3.) Mr. Umdenstock asked Mr. Gaub to have her call him, and told Mr.

4

Gaub that he would need written confirmation of her resignation so that he could notify her customers. ®. Gaub Dep. II at 281:5-282:15.) On May 30, 2008, at Mr. Umdenstock's urging and as requested by Mrs. Gaub, Mr. Gaub sent Mr. Umdenstock an email from Mrs. Gaub's computer confirming her resignation. (M. Gaub Dep. II at 155:11-157:13; R. Gaub Dep. II at 198:3-199:6, 278:3-279:6; Bailey Aff. Ex. 10 at 2.)

The next day, Mrs. Gaub told her husband that she and Mr. Umdenstock had engaged in sexual relations while in Pocatello. (M. Gaub Dep. II at 167:20-168:12.) After learning about this, Mr. Gaub called John Abele, the Vice President of Sales for PHS, to report the incident. ®. Gaub Dep. I at 171:2-13; Bailey Aff. Ex. 17 at 3.) He further indicated that he could no longer work with Mr. Umdenstock as his supervisor, and requested that Mr. Umdenstock be fired. ®. Gaub Dep. I 171:2-13; Bailey Aff. Ex. 17 at 3.) It was arranged that from then on Mr. Gaub would report to Mr. Abele. (Abele Dep. I at 48:22-25; Bailey Aff. Ex. 17 at 3.) Mr. Gaub also reported the incident to Jed Marcus, Vice President of Human Resources, and lodged a complaint against Mr. Umdenstock. ®. Gaub Dep. II at 216:6-217:10; R. Gaub Aff. Ex. CC.)

PHS conducted an internal investigation of the incident involving Mrs. Gaub and Mr. Umdenstock. (Bailey Aff. Ex. 10 at 1.) As part of the investigation, they flew Mrs. Gaub to San Diego, California, where she was interviewed by Mr. Abele and Mr. Marcus. (M. Gaub Dep. I at 159:17-24.) When Mr. Gaub asked Mr. Abele whether Mrs. Gaub needed to bring an attorney along to the San Diego meeting, Mr. Abele indicated that that would not be necessary and that it was not that kind of a meeting. (Id. at 160:1-18; 237:21-238:4.)

According to Mrs. Gaub, the meeting was not limited to a discussion of the incident involving herself and Mr. Umdenstock, and at the end of the meeting, the men mentioned that her position was being restructured. (M. Gaub Aff. ¶ 15.) Mr. Abele contends that the sole topic of discussion was the events that arose in Pocatello, but agrees that PHS did decide to eliminate her position because of performance issues specific to Mrs. Gaub and a general need to restructure the position. (Abele Dep. II at 31:6-19, 33:20-25; Bailey Aff. Ex. 10 at 2.) Both Mrs. Gaub and Mr. Abele were under the impression that she had resigned before flying to San Diego to participate in the investigation. (Abele Dep. II at 30:10-20; M. Gaub Aff. ¶ 15.)

Some time after the investigation had concluded, PHS offered Mrs. Gaub a severance agreement, which provided her $10,000 in severance pay in exchange for an agreement to release any claims she might have against PHS. (Abele Dep. II at 32:4-14; Bailey Aff. Ex. 13; M. Gaub Dep. II at 239:1-6.) The agreement allowed her twenty-one days to consider the offer, and another seven days to rescind the offer after signing. (Bailey Aff. Ex. 13.) Mrs. Gaub signed the agreement on the twenty-first day and was duly paid $10,000. (Id.) Since then, she has made no effort to rescind the agreement or to return the $10,000. (Bailey Aff. Ex. 10 at 2.) According to Mrs. Gaub, she does not remember signing the Severance Agreement as she was intoxicated at the time, and it was her understanding that her husband had to prop her up in bed so that she could sign the document.[1] (M.

---

[1] Dr. Hooft, a doctor who treated Mrs. Gaub for anxiety and possible withdrawal symptoms from her alcohol use in April 2009, submitted a letter stating that "[i]t is [his] understanding by her history that she signed a release agreement while intoxicated and was

6

Gaub Dep. II at 239:15-18.).  Mrs. Gaub is a college graduate, and
understood that she would be bound by the terms of the agreement if
she signed it.  (Bailey Aff. Ex. 15; M. Gaub Dep I at 170:14-17;
171:11-23.)

When Mr. Abele assumed responsibility for supervising Mr.
Gaub, he began to hear complaints about Mr. Gaub's job performance.
(Abele Dep. I at 48:15-6.)  After speaking with Mr. Gaub about these
complaints, Mr. Abele sent him an email on June 5, 2008, summarizing
their conversation and noting that, on the basis of several customer
complaints, it appeared to Mr. Abele that over the past several
months, Mr. Gaub's performance had slipped.  (Id. at 49:7-24; R. Gaub
Dep. II at 186:1-187:22; R. Gaub Aff. Ex. BB.)  The email identified
four specific complaints that Mr. Abele had received and recommended
several steps that Mr. Gaub could take to improve his performance.  ®.
Gaub Aff. Ex. BB; R. Gaub Dep. II at 208:8-210:17.)

Mr. Gaub acknowledged that the first two concerns raised by
Mr. Abele--that he had failed to register for blue badge status at
Cassia and that he had spoken ill about one customer to another--were
valid as he in fact had not registered for blue badge status and had
characterized one customer as "difficult" during a conversation with
another customer.  ®. Gaub Dep. II at 124:22-129:12.)  Although Mr.
Gaub agreed that the suggestions offered by Mr. Abele to improve his
job performance represented valid considerations for any sales
representative to keep in mind, he believes that he was already

most likely not capable of making a rational and informed decision at
that time.  Given her lack of sobriety it would have been ill advised
making any decision under those circumstances."  (Tharp Aff. Ex. R.)
However, in his deposition, Dr. Hooft agreed that he had no way of
evaluating Mrs. Gaub's state of intoxication at the time she signed
the document.  (Tharp Aff. Ex. S.)

performing his job in the manner suggested by Mr. Abele. (Id. at 131:7-133:12.)

On June 12, 2008, one week after the first email, Mr. Abele again discussed complaints he had received with Mr. Gaub, and sent him a second email outlining performance concerns and urging him to improve. ®. Gaub Aff. Ex. DD; R. Gaub Dep. II at 210:12-22.)

When Mr. Gaub initially received the emails, he did not view them as retaliation for having reported the incident between Mrs. Gaub and Mr. Umdenstock, but over the next several months he began to suspect that Mr. Abele might be "after [him]." ®. Gaub Dep. II at 154:7-155:17, 213:22-214:12.) According to Mr. Gaub, the emails were the first formal reprimands that he had received while at PHS; although he had been given suggestions of how to better perform his job prior to reporting the incident involving his wife and Mr. Umdenstock, the June 5 and June 12 emails were the only ones that made him fear losing his job. (Id. at 87:14-17, 109:25-110:9, 119:6-120:5.) Through December of 2008, Mr. Gaub received emails from Mr. Abele both praising and criticizing his job performance. ®. Gaub Aff. ¶¶ 13, 14, 16, Ex. II; R. Gaub Dep. II at 196:4-17.)

In January of 2008, Mr. Gaub received an Outstanding Contributor Award from PHS, honoring him for his sales work in 2007. (Umdenstock Dep. II at 27:14-23.) After Mr. Gaub reported the incident between his wife and Mr. Umdenstock, he felt that he fell under increased scrutiny. ®. Gaub Aff. ¶¶ 7, 12.) Mr. Abele began to question Mr. Gaub's sales effort, although Mr. Gaub felt that his job performance was consistent with what it had been earlier in the year, when he received the award. (Bailey Aff. Ex. 17 at 4.)

He acknowledged that several smaller hospitals had concerns about his performance prior to May of 2008, but claimed that he visited these smaller hospitals less often than they would have liked pursuant to a schedule set by his supervisors and policy set by PHS management. ®. Gaub Dep. II at 72:17-74:17, 88:3-105:15.) He also contended that the majority of the concerns raised by his customers were caused not by him, but by a fellow employee undermining him, and that the items brought to his attention by Mr. Abele represented only "minor deficiencies." (Id. at 88:3-105:15; 113:17-119:5; 124:22-130:18; 142:15-145:25.) Although the incident involving his wife was stressful, according to Mr. Gaub it did not affect his performance. (Id. at 159:15-160:2.)

Mr. Gaub attempted to address the complaints brought to his attention, including the complaints in the June 5 and June 12 emails, but these efforts became difficult as Mr. Abele stopped responding to him and other PHS employees were unobliging when he attempted to obtain necessary information from them. ®. Gaub Aff. ¶¶ 12, 14, 15; R. Gaub Dep. II at 189:1-196:17.) According to Mr. Gaub, this caused him stress and created a negative work environment. ®. Gaub Aff. ¶ 15; R. Gaub Dep. II at 226:6-230:4.)

On December 12, 2008, Mr. Gaub received a letter that terminated his employment with PHS on performance grounds. ®. Gaub Aff. ¶ 17, Ex. JJ.) Mr. Gaub claims that PHS inflated the seriousness of minor complaints to justify a retaliatory firing. ®. Gaub Dep. II at 154:7-156:14.) PHS claims that Mr. Gaub's termination was justified by his poor performance. Specifically, they had concerns about customer complaints, poor follow-through, and poor attention to detail. (Abele Dep. I at 44:19-45:9.)

The Gaubs filed individual complaints with the Idaho Human Rights Commission ("I.H.R.C.") in May of 2009, (Bailey Aff. Exs. 10, 17), and eventually filed the instant action, (Docket No. 1).

II.  <u>Evidentiary Objections</u>

"A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence."  Fed. R. Civ. P. 56(c)(2).  "[T]o survive summary judgment, a party does not necessarily have to produce evidence in a form that would be admissible at trial, as long as the party satisfies the requirements of Federal Rules of Civil Procedure 56."  <u>Fraser v. Goodale</u>, 342 F.3d 1032, 1036-37 (9th Cir. 2003) (quoting <u>Block v. City of Los Angeles</u>, 253 F.3d 410, 418-19 (9th Cir. 2001)) (internal quotation marks omitted).  Even if the non-moving party's evidence is presented in a form that is currently inadmissible, such evidence may be evaluated on a motion for summary judgment so long as the moving party's objections could be cured at trial.  <u>See</u> <u>Burch v. Regents of the Univ. of Cal.</u>, 433 F. Supp. 2d 1110, 1119-20 (E.D. Cal. 2006).

Defendant has filed a Motion to Strike, (Docket No. 57), which will be treated as objections to the affidavits, expert opinion letters, and facts and arguments submitted with plaintiffs' Oppositions to the Motions for Summary Judgment.  Defendant objects to portions of Mrs. Gaub's affidavit on the ground that it is a sham affidavit.  Defendant also objects to letters from Dr. Hooft and Ms. Ball as improper expert testimony.  Finally, defendant objects to the manner in which plaintiffs characterized many facts in their Oppositions.

Objections to evidence on the ground that the evidence is irrelevant, speculative, argumentative, vague and ambiguous, or

10

constitutes an improper legal conclusion are all duplicative of the summary judgment standard itself. See Burch, 433 F. Supp. 2d at 1119-20. A court can award summary judgment only when there is no genuine dispute of <u>material</u> fact. It cannot rely on irrelevant facts, and thus relevance objections are redundant. Instead of objecting or filing a motion to strike, parties should argue that certain facts are not material. Similarly, statements based on speculation, improper legal conclusions, personal knowledge, or argumentative statements are not <u>facts</u> and can only be considered as arguments, not as facts, on a motion for summary judgment. Nor may a court rely on statements in a party's Opposition as facts; the court must examine the submitted evidence itself. Instead of challenging the admissibility of this evidence, lawyers should challenge its sufficiency. Objections or motions to strike on any of these grounds are superfluous, and the court will overrule them.

In the interest of brevity, as the parties are aware of the substance of defendant's objections and the grounds asserted in support of each objection, the court will not review the substance or grounds of the individual objections here. The defendant's objections are all overruled.

III. <u>Discussion</u>

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).[2] A material fact is one that could affect the outcome of the suit, and a

_____

[2] Federal Rule of Civil Procedure 56 was revised and rearranged effective December 1, 2010. However, as stated in the Advisory Committee Notes to the 2010 Amendments to Rule 56, "[t]he standard for granting summary judgment remains unchanged."

genuine issue is one that could permit a reasonable jury to render a verdict in the non-moving party's favor. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). The party moving for summary judgment bears the initial burden of establishing the absence of a genuine issue of material fact and can satisfy this burden by presenting evidence that negates an essential element of the non-moving party's case. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986). Alternatively, the moving party can demonstrate that the non-moving party cannot produce evidence to support an essential element upon which it will bear the burden of proof at trial. <u>Id.</u>

Once the moving party meets its initial burden, the burden shifts to the non-moving party to "designate 'specific facts showing that there is a genuine issue for trial.'" <u>Id.</u> at 324 (quoting then-Fed. R. Civ. P. 56(e)). To carry this burden, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts." <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986). "The mere existence of a scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." <u>Anderson</u>, 477 U.S. at 252.

In deciding a summary judgment motion, the court must view the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in its favor. <u>Id.</u> at 255. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment." <u>Id.</u>

Plaintiffs' claims for Title VII retaliation are subject to

12

the McDonnell Douglas burden-shifting analysis used at summary

judgment to determine whether there are triable issues of fact for

resolution by a jury.  Steiner v. Showboat Operating Co., 25 F.3d

1459, 1464-65 (9th Cir. 1994) (retaliation); see McDonnell Douglas

Corp. v. Green, 411 U.S. 792 (1973).  Under McDonnell Douglas,

a plaintiff must first establish a prima facie case of discrimination

or other illegal conduct.  The burden then shifts to the employer to

articulate a legitimate, nondiscriminatory reason for its employment

action.  If the employer meets this burden, the presumption of

intentional discrimination or other illegal conduct disappears, but

the plaintiff can still prove disparate treatment by, for instance,

offering evidence demonstrating that the employer's explanation is

pretextual.  Raytheon Co. v. Hernandez, 540 U.S. 44, 49 n.3 (2003).

     A.   Claims Brought by Milissa Gaub

Public policy favors the voluntary settlement of employment

discrimination claims.  Stroman v. W. Coast Grocery Co., 884 F.2d 458,

460-61 (9th Cir. 1989); see also Hisel v. Upchurch, 797 F. Supp. 1509,

1518 (D. Ariz. 1992) ("[S]ettlement agreements have always been a

favored means of resolving disputes, thus, they will be entered

whenever possible.").  "The interpretation and validity of a release

of claims under Title VII is governed by federal law."  Stroman, 884

F.2d at 461.  In the Ninth Circuit, the validity of a release is

determined by examining the totality of the circumstances surrounding

plaintiff's execution of the release.  Id. at 462.

"[A]n agreement need not specifically recite the particular

claims waived in order to be effective."  Id. at 461.  For a Title VII

waiver to be valid, however, the record must show that the waiver was

"voluntary, deliberate and informed."  Id. at 462.  In determining

13

whether a waiver was "voluntary, deliberate and informed," courts
should evaluate "several indicia arising from the circumstances and
conditions under which the release was executed." Id. (quoting
Coventry v. U.S. Steel Corp., 856 F.2d 514, 522 (3d. Cir. 1988)).  In
the Ninth Circuit, there are four key factors that the court considers
in making this calculation: (1) the clarity and lack of ambiguity of
the agreement; (2) the plaintiff's education and business experience;
(3) the presence of a noncoercive atmosphere for the execution of the
release; and (4) whether the employee had the benefit of legal
counsel.  Id. (citations omitted).

        With respect to the first factor, the first sentence of the
Severance Agreement that PHS offered to Mrs. Gaub clearly stated that
it would "constitute a general release by you of any and all claims
which you might have relative to your employment with PHS."  (Bailey
Aff. Ex. 13.)  It is evident, and at oral arguments the parties did
not dispute, that such broad language covers not only the claims
brought by Mrs. Gaub under Title VII, but also her claim for
intentional infliction of emotional distress.  The release further
cautioned that it was intended to be a binding document and that Mrs.
Gaub should read its terms very carefully before signing it.  (Id.)
There is no ambiguity in the language used, and Mrs. Gaub was given
three weeks to decide whether to accept PHS's offer.

        Factor two weighs in favor of validity as Mrs. Gaub is a
college graduate with fourteen years of work experience in sales, and
understood that the document was a legal document and that, if she
signed it, she would be held to its terms.  See Nilsson v. City of
Mesa, 503 F.3d 947, 952 (9th Cir. 2007) (finding that college-level
education and work experience with police department were sufficient

14

for plaintiff to have the education and skill necessary to understand waiver).

Plaintiffs suggest that Mrs. Gaub's failure to read the Severance Agreement before signing it should invalidate it, citing Pierce v. Atchison, Topeka and Santa Fe Railway Co., 65 F.3d 562 (7th Cir. 1995).  In that case, the Seventh Circuit, like the Ninth Circuit, held that a court must examine the "totality of the circumstances" when a plaintiff claims that a waiver agreement was not entered into voluntarily and knowingly, but listed eight factors that a court should consider, id. at 571, four more than are considered key factors under the four-factor Ninth Circuit test, see Nilsson, 503 F.3d at 952 (citing Stroman, 884 F.2d at 462).  One of the additional factors the Seventh Circuit listed was "whether the employee actually read the release and considered its terms before signing it." Pierce, 65 F.3d at 571.

This court is not bound to follow Pierce, and no Ninth Circuit court has cited Pierce for any proposition.  Moreover, even if this court were to depart from established Ninth Circuit caselaw to adopt the eight-factor test from Pierce, plaintiffs have not convinced the court that Mrs. Gaub's alleged failure to read the Severance Agreement in the thirty days that she held onto it before signing it should, under the totality of the circumstances, invalidate it.

Factor four requires the court to consider whether a party consulted a lawyer before signing a waiver.  While Mrs. Gaub did not consult an attorney regarding the agreement, over the course of the three weeks no one discouraged her from seeking the advise of an attorney on the issue of the Severance Agreement.  The agreement itself expressly informed Mrs. Gaub that she had the right to consult

15

an attorney and, in signing, Mrs. Gaub represented that "she [understood] all of the terms of this Agreement and that she has either consulted with an attorney . . . or she has expressly and voluntarily waived the right to consult an attorney." (Bailey Aff. Ex. 13.); see id. at 952 (finding that where party is advised to consult an attorney, her failure to do so does not preclude a finding as a matter of law that the waiver was voluntary and knowing).

The third of the four factors considered in determining whether a waiver is voluntary, deliberate, and informed is whether the waiver was executed in a noncoercive environment. On a motion for summary judgment, the court accepts the evidence submitted by plaintiffs to show that Mrs. Gaub was suffering from anxiety, depression, and alcoholism brought on by the incident with Mr. Umdenstock during the three weeks she had to consider the Severance Agreement. Those factors, however, do not show that she signed the release in a coercive atmosphere. While her alleged condition may have made it more difficult for her to conduct her affairs, it did not create pressure on her to settle. See Ryles v. Palace Hotel, No. C 04-5326, 2006 WL 3093678, at *2-*3 (N.D. Cal. Oct. 27, 2006) (finding coercive atmosphere relying primarily on the fact that the plaintiff's counsel "misled [her] about whether she would be given a fair hearing, and threatened [her] with the loss of her home and other serious financial consequences," and not on the fact that she was suffering from depression and anxiety at the time she signed the waiver agreement).

Mrs. Gaub urges the court to find that the waiver is unenforceable because she was intoxicated at the time that she signed it, relying on Equal Employment Opportunity Commission v. American

Home Products Corp., 165 F. Supp. 2d 886 (N.D. Iowa 2001).  In American Home, the plaintiff introduced evidence in the form of her own affidavit and the depositions of her coworkers that she was abusing alcohol at the time she executed the release and that her employers knew of her alcohol abuse.  Id. at 896.  She specifically alleged that she was consuming at least a fifth of whiskey daily at work and at home, and that she was intoxicated at the time she signed the release and did not comprehend its effect.  Id.  Her employer did not dispute any of the plaintiff's evidence as to her intoxication, but introduced other evidence to suggest that the waiver was a voluntary and knowing one.  Id. at 896-99.  The court held that the plaintiff's evidence of intoxication had created a jury question on the validity of the release.  Id. at 900.

As an initial matter, the court notes that American Home, a case from a district court in another circuit, has not been cited in any other cases to support the position that a claim of voluntary intoxication is sufficient on its own to invalidate a waiver.  It seems to the court that such a proposition would fly in the face of established contract law doctrine, see Restatement (Second) of Contracts § 16 (noting that only when intoxication is so extreme as to result in legal incapacity and when other party knows of intoxication is a contract rendered voidable), and bring about absurd results. Under such a proposition, for parties to have any confidence in their ability to enforce settlement agreements, they would have to take such drastic steps as administering a blood test to establish sobriety at the moment of signature or agreeing to enter into the waiver agreement before a judge who could observe the sobriety of the signing parties. Such a rule would place unnecessary burdens on both employees and

17

employers who desire to settle their claims simply, efficiently, and independently of the courts, and undercut many of the goals of the voluntary settlement process. The court does not have to address the reasoning in <u>American Home</u>, however, because Mrs. Gaub has failed to present the court with evidence sufficient to create a dispute as to whether or not she was so intoxicated at the time she executed her agreement that she was incapable of knowingly waiving any claims against PHS.

Although Mrs. Gaub states in both her affidavit and her deposition testimony that she does not remember signing the agreement and that it is her understanding that her husband had to prop her up in bed to sign the agreement, neither of these statements is enough to create a material disputed fact. As Mrs. Gaub cannot remember these events, she cannot testify to them. Mr. Gaub, the only other party present when Mrs. Gaub signed the agreement, does not provide any evidence that his wife was intoxicated at the time she signed the waiver either. Further, while Mrs. Gaub informed the I.H.R.C. that she was "severely depressed and emotionally unstable" when she signed the release agreement, she did not mention intoxication. (Bailey Aff. Ex. 10 at 2.)

Additionally, it does not appear that, other than filing the instant proceeding and filing a complaint with the Idaho Human Rights Commission, Mrs. Gaub has made any effort to return the $10,000 she accepted from them or to otherwise reject the Severance Agreement. Even after PHS brought its motion for summary judgment and even when directly questioned on the topic by the court, plaintiffs' counsel indicated that Mrs. Gaub had no intention to return the $10,000 paid to her in exchange for her waiver. Rather, he maintained that,

because of the special value placed upon the employee rights protected by Title VII, there was no requirement whatsoever that she return the money before bringing claims that would be barred under the terms of the waiver. It is apparently plaintiff's position that if she were to go to trial on her Title VII claims she would be entitled to keep the money, win or lose. The only effect of PHS's payment in accordance with the Severance Agreement would be to offset any damages Mrs. Gaub might win at trial.

That plaintiffs would take such a position only emphasizes the absurdity of their contentions. If the court were to adopt plaintiffs' position, settlement agreements would become meaningless pieces of paper. Employers would gain nothing from voluntarily settling claims with their employees, as any employee could first agree to waive any claims in exchange for money, and then turn around and seek additional funds in court without any risk of losing the money they had already accepted. No sane employer would enter into such an agreement.

Federal courts have held that by accepting and retaining the benefits of a voidable release, a party ratifies the release and cannot avoid its obligations. See, e.g., Wittorf v. Shell Oil Co., 37 F.3d 1151, 1154 (5th Cir. 1994) ("A voidable waiver and release can still be enforced if it is ratified by the employee."); Reid v. IBM Corp., No. 95 Civ. 1755, 1997 WL 357969, at *10 (S.D.N.Y. June 26, 1997) (finding that by accepting severance pay benefits of release after the alleged undue influence, duress, and incapacity was removed plaintiff ratified the release). Thus, when Mrs. Gaub chose to "retain the severance benefits paid in consideration for signing a release, [she] express[ed] [her] intention to be bound by the release

19

and make a new promise to abide by its terms." <u>Aikins v. Tosco</u>
<u>Refining Co., Inc.</u>, No. C-98-00755, 1999 WL 179686, at *4 (N.D. Cal.
Mar. 26, 1999).

Plaintiffs have submitted a letter from Dr. Hooft, who
treated Mrs. Gaub some nine months after she signed the release, in
which he indicates that according to information about her history
provided to him by Mrs. Gaub, she was "most likely not capable of
making a rational and informed decision at [the time she signed the
release]." (Tharp Aff. Ex. R.) During his deposition, however, he
stated that that phrase was merely his "interpretation" of Mrs. Gaub's
statement to him that she signed the agreement while intoxicated.
(Hooft Dep. at 52:14-53:2.) Such an interpretation is not admissible
expert testimony. <u>See</u> Fed. R. Evid. 702 (requiring in part that the
expert's knowledge will help the trier of fact to determine a fact in
issue and that expert testimony be based on sufficient facts or data).

Because "[a] conclusory, self-serving affidavit, lacking
detailed facts and any supporting evidence, is insufficient to create
a genuine issue of material fact," <u>Fed. Trade Comm'n v. Publ'g</u>
<u>Clearing House, Inc.</u>, 104 F.3d 1168, 1171 (9th Cir. 1997) (citations
omitted), plaintiff has not sufficiently alleged that she was so
intoxicated at the time that she signed the waiver agreement that she
was incapacitated such that her waiver was not voluntary, deliberate,
and informed. Accordingly, the court must give effect to the waiver's
terms and find Mrs. Gaub's claims barred.[3]

---

[3] Because the court finds that the waiver is valid and
bars all of Mrs. Gaub's claims, the court does not reach the
parties' arguments regarding whether Mrs. Gaub established a
prima facie case for a hostile environment claim or whether PHS
established that it was shielded from liability by the Ellerth-
Faragher defense.

B.   Claims Brought by Randy Gaub

          Title VII of the Civil Rights Act of 1964 makes it "an
unlawful employment practice for an employer . . . to discriminate
against any individual with respect to his compensation, terms,
conditions, or privileges of employment, because of such individual's
race, color, religion, sex, or national origin . . . ."  42 U.S.C. §
2000e-2(a)(1).  Mr. Gaub has brought claims under Title VII for sexual
harassment and retaliation.

               1.   Sexual Harassment

          Under Title VII, to establish a claim for sexual harassment,
plaintiffs must show that they either were subjected to "quid-pro-quo
harassment," meaning that a supervisor conditioned employment benefits
on sexual favors, or that they were subjected to harassment in the
form of a hostile work environment.  See Craig v. M & O Agencies,
Inc., 496 F.3d 1047, 1054 (9th Cir. 2007) (discussing "two categories"
of Title VII sexual harassment cases).  The record contains no
evidence of any quid-pro-quo vis a vis plaintiff Randy Gaub, and,
consequently, the court addresses only whether Mr. Gaub was subjected
to a hostile work environment.

          To prevail on a hostile workplace claim under Title VII, a
plaintiff must show: (1) that he was subjected to verbal or physical
conduct of a harassing nature; (2) that the conduct was unwelcome; and
(3) that the conduct was sufficiently severe or pervasive to alter the
conditions of the plaintiff's employment and create an abusive work
environment.  See Kortan v. Cal. Youth Auth., 217 F.3d 1104, 1109-10
(9th Cir. 2000).  Sexual harassment is actionable under Title VII only
to the extent that it occurs "because of" the plaintiff's sex.  Oncale
v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 79 (1998); Nichols v.

21

1  <u>Azteca Rest. Enters., Inc.</u>, 256 F.3d 864, 872 (9th Cir. 2001).

2      Mr. Gaub complains that, following his complaint regarding

3  the incident between Mr. Umdenstock and his wife, his working

4  environment became stressful and unbearable.  Nowhere, however, does

5  he claim, or even suggest, that this was because of his sex.  Rather

6  he claims that his workplace was hostile because his supervisor had

7  sex with his wife.  Title VII does not protect from discrimination on

8  account of one's marital status.  <u>See</u> 42 U.S.C. § 2000e-2.

9      Nor can Mr. Gaub state a claim for third-party harassment.

10 "In the context of Title VII cases, the Ninth Circuit and other

11 circuit courts of appeals have repudiated bystanders' claims for

12 hostile work environment on the basis of standing where the bystander

13 was not a member of the protected class that was the target of the

14 hostile conduct."  <u>Medrano v. Genco Supply Chain Solutions</u>, No.

15 1:10-cv-01555, 2011 WL 92016, at *5 (E.D. Cal. Jan. 11, 2011) (citing

16 cases).  Although Mr. Gaub cites several cases to support his

17 contention that harassing conduct directed towards others can form the

18 basis of a hostile environment complaint, none are convincing.

19      First, <u>Thomson v. North America Stainless, LP</u>, --- U.S. ----

20 , 131 S. Ct. 863 (2011), is inapplicable to Mr. Gaub's hostile

21 environment claim.  In that case, the court found the plaintiff was

22 entitled to pursue a retaliation claim after he reported the sexual

23 harassment of his fiancee.  <u>Id.</u> at 868-70.  The court said nothing

24 about a hostile environment claim.

25      Second, in the remaining cases cited by Mr. Gaub, the

26 plaintiff himself or herself was a member of the group that was the

27 target of the harassing conduct, and all but two plaintiffs alleged

28 that harassing conduct had been directed at them.  <u>McGinest v. GTE</u>

Serv. Corp., 360 F.3d 1103, 1117 (9th Cir. 2004) (African-American plaintiff alleging harassment of African Americans); Seals v. Oil Date, Inc., No. 96-5149, 1997 WL 57133, at *2 (10th Cir. Feb. 12, 1997) (female plaintiff alleging harassment of women, including herself); Hicks v. Gates Rubber Co., 833 F.2d 1406, 1415-16 (10th Cir. 1993) (African-American female plaintiff alleging harassment of women and racial minorities, including herself); Vinson v. Taylor, 753 F.2d 141, 146 (D.C. Cir. 1985) (female plaintiff alleging harassment of women, including herself), aff'd in part and remanded on other grounds, 477 U.S. 57 (1986); Maluo v. Nakano, 125 F. Supp. 2d 1224, 1231 (D. Hawaii 2000) (female plaintiff alleging harassment of women); Leibovitz v. N.Y.C. Transit Auth., 4 F. Supp. 2d 144, 146, 150 (E.D.N.Y. 1998) (same). That is not the case here.

Accordingly, PHS is entitled to summary judgment of Mr. Gaub's hostile environment claim.

2. Retaliation

To make out a prima facie case of retaliation in violation of Title VII, a plaintiff must show "(1) involvement in a protected activity, (2) an adverse employment action and (3) a casual link between the two." Brooks v. City of San Mateo, 229 F.3d 917, 928 (9th Cir. 2000). As to the first element, an employee's formal or informal complaint regarding unlawful employment practices is a "protected activity," and a plaintiff need only show that her belief that an unlawful employment practice occurred was "reasonable." See Passantino v. Johnson & Johnson Consumer Prods., Inc., 212 F.3d 493, 506 (9th Cir. 2000); Moyo v. Gomez, 40 F.3d 982, 985 (9th Cir. 1994). As to the second element, for the purposes of a retaliation claim, a challenged action must be "materially adverse," which means that it

23

would dissuade a reasonable worker from exercising protected rights.
See Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006).
As to the third element, a plaintiff may establish a causal link
between the protected activity and the adverse action by
circumstantial evidence, including the employer's knowledge of the
protected activity and a proximity in time between the protected
action and the adverse employment act.  Jordan v. Clark, 847 F.2d
1368, 1376 (9th Cir. 1988); see also Passantino, 212 F.3d at 507
("[W]hen adverse decisions are taken within a reasonable period of
time after complaints of discrimination have been made, retaliatory
intent may be inferred.").

It is undisputed that Mr. Gaub complained to Human Resources
about the incident involving Mr. Umdenstock and his wife in May and
June of 2008.  These complaints were protected activities.  See Moyo,
40 F.3d at 985.

Plaintiffs argue that the emails sent by Mr. Abele and Mr.
Gaub's termination constitute actions that are sufficiently
"materially adverse" to constitute retaliation.  Mr. Gaub additionally
asserts that his performance was subjected to intensified scrutiny
after he made his complaint, and that after he reported the incident
his co-workers began to be unresponsive to him, making his job harder.

Termination might certainly discourage a reasonable employee
from engaging in a protected activity.  See Brooks, 229 F.3d at 928
("Among those employment decisions that can constitute an adverse
employment action are termination, dissemination of a negative
employment reference, issuance of an undeserved negative performance
review and refusal to consider for promotion.").  Subjecting an
employee to greater scrutiny might also dissuade a reasonable worker

from filing a complaint under the <u>Burlington</u> standard.  Because the allegedly retaliatory actions commenced shortly after Mr. Gaub first complained to Human Resources, he has stated a prima facie case of retaliation.  <u>See</u> <u>Bell v. Clackamas Cnty.</u>, 341 F.3d 858, 865-66 (9th Cir. 2003) (timing indicative of retaliation where negative evaluations began in May, several days after plaintiff complained, and plaintiff was ultimately terminated in December).

The burden now shifts to PHS to demonstrate a non-retaliatory reason for its actions.  <u>See</u> <u>Steiner</u>, 25 F.3d at 1464-65.  It argues that the negative reviews were justified in light of customer complaints, and that Mr. Gaub's eventual termination was justified by his failure to correct his performance.  According to Mr. Abele, he reacted to the negative comments he saw regarding Mr. Gaub's performance in the same manner as he would have had Mr. Gaub been any other employee.

Once an employer has rebutted the inference of retaliation, the burden of production shifts back to the plaintiff to show that the employer's explanation is merely a pretext for impermissible retaliation.  <u>Winarto v. Toshiba Am. Elecs. Components, Inc.</u>, 274 F.3d 1276, 1284 (9th Cir. 2001).  To establish pretext, "very little" direct evidence of discriminatory motive is required, but if circumstantial evidence is relied upon to show pretext, it must be "specific" and "substantial."  <u>Little v. Windermere Relocation, Inc.</u>, 265 F.3d 903, 915 (9th Cir. 2001).

Mr. Gaub points out that in early 2008, PHS honored him for his work, and he claims that his performance did not materially change before he made his complaint to Human Resources and began receiving negative feedback.  An unwarranted reduction in performance review

25

scores can constitute evidence of pretext in retaliation cases. <u>See</u>
<u>Yartzoff v. Thomas</u>, 809 F.2d 1371, 1377 (9th Cir. 1987); <u>cf.</u> <u>Steiner</u>
<u>v. Showboat Operating Co.</u>, 25 F.3d 1459, 1465 (9th Cir. 1994) (low
marks satisfy prima facie case, but were insufficient to prove pretext
where low marks were not the basis for any adverse actions).  Although
he admits that there were legitimate grounds for the specific customer
complaints that formed the basis of Mr. Abele's emails, he claims that
these concerns represented only minor transgressions and were, in
part, caused by co-workers and not him.  He contends that none of the
customer complaints reported by PHS, either in the initial emails or
in the months leading up to his termination, were serious enough to
merit termination.  He concludes that PHS began issuing written
reprimands, placing his performance under a microscope, and
exaggerating the seriousness of minor transgressions in order to
manufacture a pretext to fire him.

      Mr. Gaub has raised a sufficient inference, for purposes of
a summary judgment motion, that defendant's proffered reasons for the
adverse employment actions are pretextual.  Although PHS's proffered
explanations are plausible when considered on an individual basis,
when the court considers all of the actions together and the timing of
events, there is a question of fact as to whether the actions were
retaliatory.  <u>See</u> <u>Clackamas Cnty.</u>, 341 F.3d at 865-66 (finding that
"jury was entitled to disbelieve defendants' assertion that . . .
[plaintiff] was ultimately fired because of substandard performance"
where plaintiff received generally positive evaluations before
complaining about racist comments, but began receiving poor
evaluations immediately after he made his complaint).

      3.   <u>Title VII Filing Period</u>

In Idaho, a party may file employment discrimination claims with the I.H.R.C. 29 C.F.R. § 1601.80 (listing the I.H.R.C. as a certified fair employment practice agency). Accordingly, a Title VII plaintiff in Idaho "raising claims of discrete discriminatory or retaliatory acts must file his charge within [300 days]." Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 122 (2002) [hereinafter Morgan] (citing 42 U.S.C. § 2000e-5(e)(1)). A party's federal claims accrue when he discovers that there has been an adverse action, not when he discovers that his employer acted with discriminatory intent. Coppinger-Martin v. Solis, 627 F.3d 745, 749 (9th Cir. 2010) (citing Lukovsky v. City & Cnty. of S.F., 535 F.3d 1044, 1049-51 (9th Cir. 2008)). Discrete discriminatory acts, such as terminations, "are not actionable if time barred, even when they are related to acts alleged in timely filed charges. Each discrete discriminatory act starts a new clock for filing charges alleging that act." Morgan, 536 U.S. at 113 (contrasting retaliation claims, which involve discrete acts, and hostile environment claims, which are "based on the cumulative effect of individual acts").

Mr. Gaub received the written reprimands in June of 2008 and was eventually terminated in December of 2008. Each of these actions were discrete acts that Mr. Gaub was aware of at the time that they occurred, even if he wasn't aware of the retaliatory intent he alleges motivated them. As Mr. Gaub first filed claims with an appropriate state agency, he had 300 days from each act within which to file claims related to each act. The claims related to the reprimands, therefore, expired in April of 2009, and his claims related to the termination expired in October of 2009. He did not file any claims until May 1, 2009. As plaintiffs' counsel conceded at oral arguments,

the claims related to the reprimands are therefore time barred. However, the claims related to his termination are not. However, evidence of the written reprimands may be admissible as "background evidence in support of [Mr. Gaub's] timely claim" based upon his termination. <u>Morgan</u>, 536 U.S. at 113.

        IT IS THEREFORE ORDERED that defendant's motion for summary judgment as to Milissa Gaub's claims be, and the same hereby is, GRANTED.

        IT IS FURTHER ORDERED that defendant's motion for summary judgment of Randy Gaub's claims be, and the same hereby is, GRANTED as to his claim for sexual harassment, GRANTED as to his claim for retaliation on the basis of the written reprimands, and DENIED as to his claim for retaliation on the basis of his termination.

DATED:  January 9, 2012

WILLIAM B. SHUBB
UNITED STATES DISTRICT JUDGE